Albert R. GELLENTHIN, Sr., Albert R. Gellenthin, Jr., and Paul L. Gellenthin, t/a Gellenthin Oil Transport Company, Owners of the ARGOIL NO. 105, Libellants,

v.

S.S. CONCORDIA SUN, her engines, boilers, tackle, machinery, etc., Respondent.

D/S I/S IDAHO, Libellant,

v.

TUG REBECCA and Tank Barge Argoil No. 105, Respondents.

Nos. 373 and 403 of 1956.

United States District Court
E. D. Pennsylvania.

May 9, 1962.

On Rehearing Aug. 14, 1962.

T. J. Mahoney, Philadelphia, Pa., for Concordia Sun and D/s I/s Idaho, her owners.

Harrison G. Kildare, Philadelphia, Pa., for Gellenthin Oil Transport Co., Tug Rebecca and Tank Barge Argoil No. 105.

GANEY, Circuit Judge.*

In connection with the above mentioned matters, the court makes the following Findings of Fact:

1. Albert R. Gellenthin, Sr., Albert R. Gellenthin, Jr., and Paul L. Gellenthin, trading as Gellenthin Oil Transport Company, at all times material to these suits, owned and operated the tug Rebecca and tank barge Argoil No. 105.

2. The tank barge Argoil No. 105 is a steel-hull, motorless oil barge, 195 feet long, 35 feet broad with a draft of 10 feet. The tug Rebecca is a steam-powered harbor tug 75 feet long with a draft of 7 feet and a capacity of 300 horsepower.

3. The Concordia Sun is an 8500 horsepower diesel cargo ship of 4700 gross tons. It is 419 feet 6 inches long, her beam is 56 feet 10 inches and her draft is 13 feet forward and 19 feet aft.

4. By agreement of counsel, the original suit, No. 373 of 1956, In Admiralty, and the cross-libel, No. 403 of 1956, were tried together.

5. On October 10, 1956, at 6:35 p. m., daylight time, the tug Rebecca and the tank barge Argoil No. 105, fully laden with a cargo of oil which was made fast

* Specially designated to sit in the District Court.

to her starboard side so that the stern of the tug projected aft of the stern of the barge, proceeded from the Gulf Refining Company, Girard Point, Philadelphia, Pennsylvania, down the Delaware River bound for Baltimore, Maryland. The tide was ebbing at 1½ knots and visibility was clear for 8–10 miles.

6. The tug Rebecca and barge, making about 5½ knots over the ground, were navigating over the eastern or New Jersey side of the Delaware River. The Rebecca would navigate in the channel and on occasion swing out of the channel toward the Jersey side whenever a ship was sighted going upbound, otherwise she did not leave the channel.

7. The Concordia Sun picked up Pilot Harry D. Lemmon at Chesapeake City, New Jersey, at 5:10 p. m., daylight time, and proceeded up the Delaware River toward Philadelphia. Pilot Lemmon held State and Federal licenses for pilotage on the Delaware River and had thirty years experience as a Delaware River pilot.

8. The channel on the Chester and Marcus Hook ranges is 800 feet wide. The upstream or Chester range is 1.08 nautical miles in length, and the downstream or Marcus Hook range is 4.27 nautical miles in length. Proceeding from the Chester range into the Marcus Hook range there is a bend of 7 degrees to the right, that is to the Pennsylvania side of the River. At the junction of the two ranges, the western side of the channel is marked by bell buoy 1C, which has a quick-flashing green light, and on the eastern or Jersey side it is marked by an unlighted nun buoy designated as 2C.

9. A little less than a nautical mile on the Chester range above nun buoy 2C, on the eastern or New Jersey side of the channel, is a flashing buoy, 4C.

10. The tug Rebecca and barge Argoil No. 105 were proceeding on the Chester range at buoy 4C on the eastern side of the channel and then gradually navigated along the eastern edge thereof until they reached nun buoy 2C, when they went outside of it and in passing it they were 20 feet beyond nun buoy 2C.

11. The tug Rebecca was operating with both red and green running lights, range lights and two vertical lights on the masthead and was about a mile and a half away from the Concordia Sun when it observed the Concordia Sun's red and green running lights coming head-on, and the same were visible to within 1,000 feet of the Concordia Sun. The tug Rebecca saw no other vessel around it.

12. The Concordia Sun was being navigated upstream on a course 2 degrees to the right of the range course in the Marcus Hook segment of the channel. The Pilot of the Concordia Sun saw the Rebecca when he was about a mile and a half away with both red and green running lights showing, and the Marosa, a vessel coming downstream on the western side of the channel on the Chester range, was about a mile astern of the tug Rebecca and barge.

13. The Concordia Sun was proceeding upstream at about ½ speed when it blew one blast of its whistle, seeing the running lights and navigation lights of the tug Rebecca head-on. This signal constituted the usual port-to-port passing.

14. A lapse of thirty seconds to a minute occurred after the Concordia Sun blew its one blast when the Pilot ordered 10 degrees starboard, indicating a port-to-port passing. The tug Rebecca responded with two blasts. The Captain of the Rebecca, after a short interval, blew a two-blast signal and went sharply to port about a quarter of a mile below nun buoy 2C.

15. When the tug Rebecca blew the two blasts, the Pilot on the Concordia Sun observed the port light closing out and only the green light showing. After the two-blast signal the Captain of the Concordia Sun, then three-quarters of a mile away, ordered all port, momentarily, in an attempt to answer the tug's starboard-to-starboard passing, but immediately realized that the Marosa, which was coming down on the western side of the channel, made it impossible for him to

clear both the tug and barge and the Marosa and countermanded immediately to starboard, as well as ordered all engines astern, and they remained so about three minutes until the collision.

16. Both the tug and barge and the Concordia Sun then were out of the channel and both headed toward the eastern or Jersey shore trying to avoid a collision, which was inevitable, when the tug and barge made a complete turnabout and the starboard quarter of the barge struck the Concordia Sun's port side of the bow some 25 feet aft of the stem, seriously damaging the bow and starboard side of the barge and causing holes in three or more places. After the collision the barge became free and slid down the port side of the Concordia Sun.

## DISCUSSION

The main contention to be resolved here is which of the two vessels, the tug Rebecca with barge, or the Concordia Sun, blew the first whistle. There is a conflict of testimony concerning it in the record.

The testimony of George W. Lynch, Chief Engineer of the tug Rebecca, was to the effect that the weather was clear and that there was excellent visibility. There is a discrepancy in his testimony concerning the distance between his tug and the Concordia Sun for, at one place in his testimony, he says that the first time he saw the Concordia Sun was when he was 1,000 feet distant from it and, at another time, that he was 3/4 of a mile away when he first saw it. He further testified that when he saw the Concordia Sun both its red and green running lights were visible and both vessels were head-on. Further, that about two minutes after the tug had passed nun buoy 2C, Captain Insley, of the tug Rebecca, blew two whistles and turned left or to port. Within 15 seconds he blew two more blasts of the whistle and then, almost immediately, blew four or five whistles indicating a danger signal. After the second two-blast signal, he said he could see the red and green running lights of the Concordia Sun at a couple

of thousand feet away; that they were going about 5½ knots. The Pilot of the tug ordered the engines full astern and the Concordia Sun hit the right side of the barge tied to the tug. He indicated the collision took place 2½ miles below nun buoy 2C and a couple of hundred feet from the eastern end of the channel on the New Jersey side. It was agreed that the distance between the eastern edge of the channel to the Jersey shore was some 1,500 feet to shallow water 10–12 feet deep. He later changed his testimony by saying that the collision took place 1,500 yards from nun buoy 2C and 1,000 feet from the eastern or New Jersey shoreline. The only signal he heard from the Concordia Sun was a one-blast whistle and this was after two two-blast signals of the tug Rebecca and 4–5 danger signals.

Thomas W. Lotman, a deckhand on the tug Rebecca, testified that he was below getting coffee when he heard the Captain blow two whistles and he came out and walked forward and the only thing he could see of the lights of the approaching vessel was a red light on a kind of an angle to him, but he could not give any estimate of the distance the ship was from the tug. Further, that he stood there on the deck and four minutes later there was a smashup and he jumped off the tug to the barge. He did not see the actual collision, nor which ship ran into the other.

The testimony of Pilot Lemmon of the Concordia Sun was that he was in the eastern side of the channel when he was about a mile and a half from the tug Rebecca coming downstream, he could see its red and green running lights showing and he blew one whistle, which was notice to the tug and barge that a port-to-port passing was to be made. The next signal heard by him was a two-blast signal from the tug Rebecca, which was a cross-signal, indicating, as adverted to above, a starboard-to-starboard passing. When about 3/4 of a mile from the tug Rebecca, noting its port light fading out, the Pilot of the Concordia Sun attempted, momentarily, a starboard-to-starboard passing in an effort to comply with the signal

from the tug Rebecca by ordering a hard to port, but it immediately became apparent to him that it would be dangerous to make such a passing because it would necessitate his going between the barge tied to the starboard side of the Rebecca and the steamship Marosa, which was coming downstream on the western or Pennsylvania side of the channel. He immediately ordered hard to starboard with all engines astern and both vessels were headed in the general direction of the New Jersey shore with the tug and barge making a complete 360 degree turn and striking the Concordia Sun 25–30 feet from its steam above the water line. The lines on the tug and barge parted and the barge slid down the port side of the Concordia Sun.

The Captain of the ship Marosa, which was astern of the tug and barge on the western or Pennsylvania side of the channel, going downstream, corroborated the testimony of Pilot Lemmon of the Concordia Sun that he blew the first whistle indicating a port-to-port passing. He further confirmed the judgment of Pilot Lemmon in that, while he said that when he first observed the Concordia Sun with its red and green running lights showing, it might have been possible, before any whistle was blown, for the Concordia Sun to have made a starboard-to-starboard passage of the tug Rebecca and barge. However, as they came on to each other, head and head, he said that it would have been impossible to make a starboard-to-starboard passing of the tug Rebecca because the Concordia Sun was such a large ship that there was no room for maneuverability between the tug and his own ship. The depositions of four other witnesses, John Eikeland, Evert Kjoenoe, Ole Refsland and Alessandro Zerbi, all on the Concordia Sun, testified to the fact that it blew the first whistle, indicating a port-to-port passing.

Additionally, it is extremely difficult to believe the testimony of Chief Engineer Lynch, of the tug Rebecca, that the only signal he heard from the Concordia Sun came after the danger signals of the tug Rebecca since Captain Lemmon, of the Concordia Sun, was a pilot with long experience and to call for a port-to-port passing in this situation is difficult to understand. However, this testimony may be accounted for since Lynch later testified that after he heard the first two-blast signal of his tug, he became confused.

This conduct on the part of Captain Lemmon was corroborated by Captain Miller, of the Marosa, by virtue of his position on the western side of the channel where he was in an excellent position to observe the conduct of the vessels.

Under all the circumstances, including the positions of the vessels being head-on with running lights showing on both vessels, plus the added corroboration of the testimony of the Captain of the Marosa, it is concluded that the Concordia Sun blew the first whistle and that this was proper under the circumstances. This is in conformity with the navigation rules covering approaching vessels passing each other. 33 U.S.C.A. § 203, Rule 1.[1]

There was some testimony concerning whether the tug Rebecca and barge were in the channel on the eastern side of its center line at the time it passed nun buoy 2C. Despite the contradiction in testimony by the Captain of the tug and the Pilot of the Concordia Sun, it is determined that the tug and barge were in the channel east of the center line as it passed nun buoy 4C and came on downstream and went outside a very short distance, some 20–40 feet as it passed nun buoy 2C. It seems immaterial to the decision in the case whether or not the tug Rebecca and barge were inside the channel at nun buoy 2C or they were outside, as has

1. 33 U.S.C.A. § 203, Rule I. "When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other. * * *"

been indicated, relatively only a few feet, and continued on downstream at about that distance from the eastern edge of the channel because on the testimony of the libellant's own witness, the collision occurred only 200 feet east of the eastern edge of the channel. Since, during this time, the running lights of both vessels were visible, one to the other, and proceeding head-on and with plenty of water outside the eastern edge of the channel for a port-to-port passing, the focal point for determination is whether or not a port-to-port passing was feasible by virtue of their positions in the channel and it is held here that it was.

Accordingly, it is unnecessary to pass on the testimony of Captain Insley, of the tug Rebecca, given before the Coast Guard in an investigation of the collision, who died before trial of the case, for while it has been found that the tug Rebecca and barge were outside nun buoy 2C, the position of the vessels and the depth of the water for more than 1,000 yards below nun buoy 2C are really determinate of the situation, it has been found that the Captain of the Concordia Sun blew one whistle first.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and of the subject matter.

2. The collision was wholly caused by the flagrant and inexcusable faults of the Rebecca.

3. The Libel in No. 373 of 1956 is dismissed and final decree may be entered against the libellants and in favor of the respondent, with costs to the respondent.

4. In No. 403 of 1956 a decree may be entered in favor of libellant against the respondents with costs to the libellant, with provision for referral of the action to a special commissioner for ascertainment of the damages sustained to Concordia Sun unless the parties shall agree thereof within thirty days.

## ON REHEARING

A rehearing was allowed herein and the same points were advanced at the hearing as were pressed upon the court originally.

Counsel for libellant makes the point that the court was in error in its opinion in stating that libellant's witness, Lynch —the only witness for the libellant who gave testimony as to distances, and to seeing the collision—testified the collision took place 1000 feet from the New Jersey "shore line". It is obvious that "shore line" is an error and should be "channel line", and it is herewith corrected to read "channel line". In addition, the word "steam" in the middle of page 8 of the opinion is corrected to read "stem".

In connection therewith, it was extremely difficult for the court to accept as being true some of the statements made by the witness, Lynch. For example, it would be unreasonable to believe his testimony that the tug blew two whistle blasts indicating a starboard passing, and again two whistles, with no answering signals, and then only after four to five blasts indicating danger, that the Concordia Sun blew a one-blast signal for a port-to-port passing. It is inconceivable that an experienced pilot, such as the one then aboard the Concordia Sun would, for the first time, blow one whistle indicating he wished a port-to-port passing, after the alleged successive group of blasts by the tug. This, likewise, in the face of Lynch's testimony that he could plainly see the red and green running lights of the Concordia Sun after the second two-blast signal from his tug. Further, he stated that the distance was 500 feet from the eastern channel line to shoal water on the New Jersey shore and, even upon prompting, repeated to his counsel that it was 500 feet. Later, after a recess, he changed his testimony as to the distance from the eastern channel line to the point of collision to 1000 feet. It is difficult to reconcile this statement with the one immediately before that it was only 500 feet from the eastern channel line to shoal water, since he testified the collission took place in shoal water.

The court prefers to believe the testimony of the witness, Lynch, given at

the outset of his examination when he testified that the collision occurred 200 feet from the eastern channel line, which he said repeatedly, twice to his counsel and once to the court, with counsel at his elbow and with the maps of the channel, on which he made descriptive markings, in front of him.

The findings of fact and conclusions of law in the original opinion of this court, dated May 9, 1962, except for the minor errors herein corrected, are reaffirmed.